UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES WILLIAM OWENSBY,

        Plaintiff,                Case No. 17-10141

v.                            Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

**OPINION AND ORDER**

Plaintiff James William Owensby ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have filed summary judgment motions. For the reasons set forth below, Defendant's Motion for Summary Judgment [Docket #19] is GRANTED, and Plaintiff's Motion for Summary Judgment [Docket #16] is DENIED.

**I. PROCEDURAL HISTORY**

Plaintiff applied for SSI on October 31, 2013 and DIB on June 25, 2014 alleging disability as of July 25, 2013 and October 29, 2013 respectively (Tr. 162, 169). After the initial denial of benefits, Plaintiff requested an administrative hearing, held on September 3,

2015 in Mount Pleasant, Michigan (Tr. 41). Administrative Law Judge ("ALJ") Stephen

Marchioro presided. Plaintiff, unrepresented, testified (Tr. 51-82), as did Vocational Expert

("VE") Mark A Richards (Tr. 82-89). On January 20, 2016, ALJ Marchioro found Plaintiff

not disabled (Tr. 23-36). On January 7, 2015, the Appeals Council denied review (Tr. 1-3).

Plaintiff filed for judicial review of the final decision on December 12, 2016.

## II. BACKGROUND FACTS

Plaintiff, born March 5, 1995, was 20 at the time of the ALJ's decision (Tr. 36, 162).

He obtained a GED at the age of 18 (Tr. 183). He alleges disability due to hearing problems,

depression, bipolar disorder, and an unspecified cognitive impairment (Tr. 182).

### A. Plaintiff's Testimony

Plaintiff, unrepresented, offered the following testimony:

He stood 5' 7" and weighed 195 pounds (Tr. 51). He was single and lived with his

mother's boyfriend in Saginaw Michigan in a single family home (Tr. 52). He had no source

of income but received a bridge card (Tr. 53). He received childhood disability benefits for

a hearing problem which had ceased when he turned 18 (Tr. 53). His mother received

disability payments for a speech disorder and psychological problems (Tr. 53-54). Plaintiff

had a learner's permit did not have a driver's license (Tr. 54). He did not take buses because

he was "scared of some people" (Tr. 54). He relied on others for rides (Tr. 54). Up until an

accident, he used a skateboard and bicycle for transportation (Tr. 54).

Plaintiff repeated first grade and was placed in special education classes due to

hearing and speech impairments (Tr. 56).  He denied being expelled (Tr. 56).  He had never received vocational training (Tr. 57).  He made money by selling blood plasma and selling scrap metal (Tr. 58).  His formal employment history was limited to working as a salesperson for three days (Tr. 58).  He was not receiving mental health treatment but currently took Trileptal, Zoloft, and Abilify with good results (Tr. 59).  He experienced the side effects of dizziness and nausea (Tr. 59-60).  He denied the use of medical marijuana (Tr. 60).  His right leg hurt "constantly" since he was hit by a car (Tr. 60).  Following the accident, a metal rod was implanted in his leg (Tr. 61).  He had not received leg treatment since the surgery (Tr. 61).  He did not require the use of a cane but had to "drag" his leg when he walked (Tr. 63). He used a leg splint at night (Tr. 64).  Since the leg surgery, he was hospitalized for one day for kidney failure (Tr. 61).  He had not received treatment for kidney problems since being discharged but had been advised to drink "less pop" and eat "more veggies" (Tr. 62).  He had hernia surgery when he was 15 (Tr. 62-63).

As a teenager, he received inpatient mental health treatment (Tr. 65).  He denied smoking or alcohol use (Tr. 65).  He was fully deaf in his left ear and his hearing went "in and out" in the right ear (Tr. 65).  He had a hearing aid which was currently "in the shop getting fixed" (Tr. 66).  He experienced concentrational problems (Tr. 66).  Plaintiff could sit for unlimited periods but was unable to stand for 10 minutes due to dizziness and leg pain (Tr. 66).  He passed out around twice a week (Tr. 66).  He did not experience fine manipulative problems (Tr. 69).  He did not experience problems bending (Tr. 69).  He was

able to lift up to 15 pounds from a sitting position but not from a standing position due to dizziness (Tr. 69-70).

Plaintiff spent most of his time playing games with his mother and sister and video games with his brother (Tr. 70, 73). His brother received disability due to schizophrenia (Tr. 73). He remained friends with a former girlfriend who had moved to California (Tr. 71-72). He interacted with other school and neighborhood friends and sometimes read books and wrote in a journal (Tr. 73). He was able to take care of his own personal needs and make simple meals (Tr. 75). He used a wheelchair when shopping for groceries (Tr. 75). He had a cat (Tr. 76). Plaintiff stated that he was unable to work due to hearing problems, leg pain, anger management problems, and memory problems (Tr. 76). He would be unable to perform a simple, sedentary job without public interaction due to his paranoia and hallucinations (Tr. 78).

**B.     Medical Evidence and Educational Evidence**

**1.  Evidence Related to Plaintiff's Treatment[1]**

A December, 2012 Individualized Education Program ("IEP") report notes that Plaintiff could "do grade level work;" enjoyed math and science; and was "on task most of the time" (Tr. 223). The same portion of the report states that Plaintiff was "on task 50 percent of the time" in the classroom setting (Tr. 223). The report states that Plaintiff could

---

[1]Treating records predating the alleged onset date of July 25, 2013 are included where relevant to the current claim.

do "grade level work," but in the next sentence, states that he was at the 8.5 grade level in math (Tr. 223). The report notes that Plaintiff wanted to go to college (Tr. 225).

A February, 2013 psychological intake assessment by Mohammad Jafferany, M.D. notes "noncontributory for musculoskeletal issues" (Tr. 279). Plaintiff appeared appropriate with a cooperative attitude but a depressed affect (Tr. 280). His judgment and insight were deemed intact (Tr. 280). He demonstrated impaired concentrational and language skills (Tr. 281). He was diagnosed with bipolar disorder with delays in development and "unspecified mental retardation" with worsening symptoms (Tr. 282). He received a passing score on the GED in May, 2013 (Tr. 307). June, 2013 records by Katherine Heidenreich, D.O. note Plaintiff's report of ongoing hearing loss (Tr. 264). Plaintiff reported that he used hearing aids intermittently (Tr. 264). An audiogram showed "borderline mild" hearing loss in the right ear and "severe" loss on the left (Tr. 264). A physical examination was otherwise normal (Tr. 264). An MRI of the internal auditory canals was unremarkable (Tr. 265). The same month, psychiatric treating records note "extreme mood swings with intense and rageful anger and aggression outwardly" (Tr. 284). However, Dr. Jafferany's records from August, 2013 note that Plaintiff's report of good results from Abilify (Tr. 290).

In September, 2013, Plaintiff reported that he was physically active every day and denied depression (Tr. 275). Other portions of the same exam note that Plaintiff reported "severe mood swings and that most of the time he was depressed with no motivation" (Tr. 278). He denied problems concentrating at school (Tr. 278). The same month, Dr. Jafferany

discharged Plaintiff from semi-independent living, noting an improvement in mood swings (Tr. 296). He cautioned that "impulsive and high risk behavior still remain[ed] a problem . . . ." (Tr. 296, 302). Plaintiff was scheduled for a followup visit in two months (Tr. 306).

The following month, Plaintiff received emergency treatment for fractures of the tibia and fibula after he was struck by a car (Tr. 341, 390). A CT of the brain was unremarkable (Tr. 343, 392). Surgery for the implantation of a rod was performed without complications (Tr. 356-357, 359-361). Followup records note a normal affect (Tr. 364).

Plaintiff sought emergency treatment in September, 2014 for lightheadedness (Tr. 377). He reported occasional left leg pain (Tr. 377). An inspection of the extremities was unremarkable (Tr. 379). Plaintiff was advised that the medications Abilify, Trileptal, and Zoloft could cause dehydration and lightheadedness (Tr. 382). November, 2014 records note that Plaintiff had recently fainted at a plasma center while donating blood plasma (Tr. 319, 322). He denied any symptoms of depression, but "became teary" when his mother left the room (Tr. 326, 329). Plaintiff reported that his pets included five cats (Tr. 320). A physical examination was unremarkable (Tr. 321). He denied joint pain and exhibited a normal gait (Tr. 324). He denied the use of drugs (Tr. 328). In March, 2015, Plaintiff sought emergency treatment after getting in a fight (Tr. 367). A physical examination and imaging studies were unremarkable (Tr. 368, 399, 403). In May, 2015, Plaintiff sought emergency treatment for dizziness but reported that he felt better now that the weather was improving (Tr. 409). His answers to a questionnaire were consistent with moderate depression (Tr. 405).

## 2. Consultative and Non-Examining Sources

In February, 2014, Leon Austin, Psy.D. performed a consultative psychological examination of Plaintiff on behalf of the SSA, noting Plaintiff's report of bipolar, depression, a cognitive impairment, and partial deafness (Tr. 308). Dr. Austin noted that Plaintiff's report of childhood abuse and current thoughts patterns were consistent with Post Traumatic Stress Disorder ("PTSD") (Tr. 308). Plaintiff also described symptoms of bipolar disorder including inflated self-esteem, decreased need for sleep, racing thoughts, and impulsive behavior (Tr. 308). Plaintiff reported that he had one close friend and got along well with his family (Tr. 309). He reported good self esteem and did not display unusual motor activity (Tr. 309). He denied hallucinations or suicidal ideation (Tr. 310). He appeared fully oriented with good memory skills (Tr. 310). Dr. Austin noted that intelligence testing placed Plaintiff in the borderline range for intellectual functioning (Tr. 311).

Dr. Austin concluded as follows:

> [Plaintiff's] ability to relate and interact with others, including coworkers and supervisors, is impaired. His depression and distress could affect his interperson relationships in the workplace. He is able to perform simple tasks with no major limitations. He should not struggle with familiar routines and tasks, but her may struggle with those that have multiple steps and increased complexity. His ability to maintain concentration does seem somewhat impaired. As a result of his emotional state and intellectual functioning he may often be distracted and his effectiveness and performance will likely be limited and slowed. His ability to withstand the normal stressors associated with a workplace setting is somewhat impaired (Tr. 312).

The same month, Dale Blum M.D. reviewed the physical treating records on behalf of the SSA, finding that Plaintiff did not experienced any exertional limitations but

experienced communicative limitations due to hearing loss (Tr. 102-103).

The following month, Bruce G. Douglass, Ph.D. examined the treating and consultative psychological records on behalf of the SSA, finding that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 100-101). He found marked limitation in the ability to carry out detailed instructions but found otherwise moderate concentrational limitations (Tr. 104-106).

## C. Vocational Expert Testimony

VE Mark Richards found that Plaintiff did not have past relevant work (Tr. 82). The ALJ then posed the following set of limitations to the VE, describing a hypothetical individual:

> Please assume an individual who can perform work with no exertional limits,[2] who should only occasionally be exposed to excessive noise. Who should avoid all use of unguarded moving mechanical parts, all exposure to unprotected heights. Additionally, this hypothetical person would be limited to occupations that can be performed with hearing in only one ear. Additionally, this person is limited to work involving simple, routine, and repetitive tasks with only simple work-related decision-making, only occasional changes in the work setting, and only occasional interaction with

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

the public, occasional interaction with coworkers, and occasional supervision.
Are there any jobs, without exertional limitations, in the national economy that
a person with this hypothetical profile could perform? (Tr. 83).

The ALJ then added another limitation: "the hypothetical person could only

occasionally be exposed to levels four and five noise" (excessive noise) but could frequently

or constantly be exposed to levels one through three (office-level noise) (Tr. 84).

The VE responded that the hypothetical individual could perform the unskilled,

exertionally light jobs of marker (225,000 jobs in the national economy); router (168,000);

and photocopying-machine operator (20,000) (Tr. 85-86). The VE testified further that if

the hypothetical question were amended to limit the individual to "occasionally climb ramps

or stairs but never climb ladders, ropes, or scaffolds, [and] never operate foot control

operations" with the right lower extremity, the job findings would remain unchanged (Tr. 86-

87).

The VE testified further that the additional restriction of a sit/stand option allowing

the individual to stand for 10 minutes then sit for 60 would limit the above-described

individual to sedentary work (Tr. 87). He testified that the individual could perform the

sedentary work of a touch up screener (12,000); final assembler (optical) (23,000); and

surveillance system monitor (10,000) (Tr. 88). He stated that if the same individual were off

task 15 percent of the day aside from scheduled breaks, or, were required to take three

unscheduled absences each month due to mental health problems, all competitive work

would be precluded (Tr. 89).

**D. The ALJ's Decision**

Citing the medical records, ALJ Marchioro found that Plaintiff experienced the severe impairments of "bipolar disorder, anxiety disorder, borderline intellectual functioning, hearing loss, and status post fracture of right lower extremity" but that none of the conditions met or medically equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 26). He found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 27). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:

> [H]e can only occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can never perform foot control operations with the right lower extremity. He can only occasionally be exposed to excessive noise (only occasional exposure to noise levels 4 and 5 and constantly to levels 1 through 3); must avoid all use of unguarded moving mechanical parts; and must avoid all exposure to unprotected heights. He is limited to occupations that can be performed with hearing in only one ear. He is limited to work involving simple, routine, and repetitive tasks with only simple work-related decision making, only occasional changes in the work setting, and only occasional interaction with the public and coworkers and occasional supervision (Tr. 28).

Citing the VE's findings, the ALJ found that Plaintiff could work as a marker, router, and photocopying machine operator (Tr. 35, 85-86).

The ALJ discounted Plaintiff's alleged degree of limitation, citing audiogram results showing only mild hearing loss in the good ear (Tr. 30). He cited treating records showing that Plaintiff complained of only intermittent leg pain after surgery and demonstrated a

normal gait (Tr. 30). As to the allegations of disabling psychological limitation, the ALJ

noted that Plaintiff obtained good results from Abilify, citing treating records stating that he

"had no trouble with focusing and concentration at school . . . ." (Tr. 31). The ALJ noted that

while intelligence testing showed a full scale IQ of only 78, Plaintiff had a close friend, got

along with family, and shared household responsibilities (Tr. 32). The ALJ cited school

records showing that Plaintiff was usually on task and "was able to do grade level work (Tr.

33).

## III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of*

*Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more

than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.

1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health*

*& Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the

administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

### The ALJ's Choice of Hypothetical Limitations

Plaintiff argues that the hypothetical question to the VE and the identical RFC found

in the administrative opinion did not account for his full degree of psychological limitation. *Plaintiff's Brief,* 6-13, *Docket #16.* He contends that the ALJ's rationale for accepting some of the professed limitations but not others amounts to a mis-characterization of the record evidence. *Id.*

Plaintiff is correct that a VE's job findings made in response to a "hypothetical" question, and by extension, the ultimate RFC, constitutes substantial evidence only if it accurately portrays the individual's relevant impairments. *Varley v. Commissioner of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987). While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir.2004).

**1. The IEP Report**

Plaintiff takes issue with the ALJ's interpretation of the IEP report, noting that while the ALJ accorded "great weight" to the report, he failed to acknowledge the sections of the report supporting a disability finding. *Plaintiff's Brief* at 6-9 (*citing* Tr. 223-227)).

The ALJ accorded "great weight" to the IEP, citing the report that Plaintiff "placed himself in the best optimal listening area within the classroom" to compensate for his hearing problems and "was on task most of the time and was able to do grade level work" (Tr. 22, 233). The ALJ also noted that Plaintiff was able to obtain a GED despite borderline

intellectual functioning and liked to read science-fiction books and play board and video games (Tr. 33).

Plaintiff disputes the administrative finding that he was "was on task most of the time and was able to do grade level work." He notes that the IEP states that his NWEA Math score was actually at the 8.5 level and that he was on task only 50 percent of the time in the classroom *Id.* at 7 (*citing* Tr. 223-225)). In fact, the IEP states both that Plaintiff was on task most of the time *and* at another point in the same report that he was "on task 50 percent of the time" in the classroom (Tr. 223). Likewise, the report states at one point that Plaintiff scored at the 8.5 grade level in math, and elsewhere that he could "do grade level work," (Tr. 223). However, the ALJ's citation to the more favorable findings does not constitute error. While the IEP report does identify some weaknesses in Plaintiff's learning abilities in staying on task in a classroom setting and in math, the report indicates that he was working at grade level in other subjects, and, was able to stay on task "most of the time" when not in a classroom setting (Tr. 223).

Moreover, the ALJ also supported his finding that the psychological limitations were not disabling with other portions of the record. He also noted that Plaintiff was able to obtain a GED, play games of strategy, and read books (Tr. 33). As such, the ALJ's citation to the favorable portions of the IEP, along with the other evidence, constitutes substantial evidence in support of the non-disability finding.

### 2. Dr. Austin's February, 2014 Findings

Plaintiff also faults the ALJ for failing to acknowledge Dr. Austin's more negative findings which included the finding that Plaintiff could be "distracted" with a "limited" and "slowed" workplace performance due to psychological limitations. *Plaintiff's Brief* at 9-11 (*citing* Tr. 32, 312)). However, the ALJ's paragraph-long summation of Dr. Austin's consultative findings adequately reflects the record. The ALJ acknowledged Dr. Austin's finding that Plaintiff ability to interact with others, concentrate, and react to stressful situations was "impaired" (32, 312). It cannot be said that the ALJ "sugarcoated" Dr. Austin's finding of significant psychological workplace limitation. The ALJ noted that aside from the above-stated findings, Dr. Austin also found that Plaintiff was able to perform simple tasks without major limitations. The ALJ further noted that while Dr. Austin found a substantial degree of psychological limitation, the more recent records supported the non-disability finding (Tr. 32). The ALJ noted that despite some "cyclical ups and downs," Plaintiff's condition improved dramatically with medication , noting further that Plaintiff was not compliant with recommendations to continue mental health treatment but nonetheless, had the wherewithal to engage a variety of daily activities including playing board games, reading books, playing video games, writing in a journal, and taking care of household chores (Tr. 32-33). The ALJ did not err in finding that the treating records of good results from psychotropic medication and Plaintiff fairly wide range of activities stood at odds with the allegation of disability.

### 3. Joe Stewart's Third Party Report

Finally, Plaintiff also challenges the ALJ's accord of only "little weight" to Social Worker Stewart's third party report, noting Stewart's finding of disability level limitation. *Plaintiff's Brief* at 11-13. He contends that Stewart's opinion was consistent with Dr. Austin's consultative findings and the unfavorable portions of the IEP. However, the ALJ's discussion of Stewart's findings is well supported and explained. The ALJ cited Stewart's finding that Plaintiff was "easily taken advantage of," "drawn into useless purchases," and was incapable of handling money or a budget (Tr. 33 *citing* 192). However, the ALJ did not err in finding that Stewart's report also included the finding that Plaintiff engaged in a number of household chores including caring for a pet, preparing simple meals, cleaning, and performing yard work (Tr. 191). Consistent with the ALJ's finding, Stewart's report states that despite that Plaintiff sometimes required to reminders to engage in personal care and household activities, he was able to take of his own needs without problems (Tr. 190-191). The ALJ did not err in noting that Stewart's opinion of disability was undermined by portions of his own report. Moreover, while Stewart found that Plaintiff was unable to pay bills, handle a savings account, or use a checkbook, the jobs of marker, router, and phtocopying-machine operator (as found by the VE) do not require money-managing skills (Tr. 35, 83).[3]
 Because the ALJ's finding that Plaintiff could perform unskilled work with simple work-

---

[3]Stewart's findings also stand at odds with Dr. Douglass' non-examining finding that Plaintiff experienced only mild limitation in activities of daily living and only mild limitations in social functioning and concentration, persistence, and pace (Tr. 100-101).

related decision making with only "occasional changes in the work setting" and only occasional interaction with the public, coworkers, and supervisors is supported by substantial evidence, a remand on this basis is not warranted (Tr. 28).

In closing, it should be noted that my determination that the ALJ's finding are well supported should not be read to trivialize Plaintiff's former personal difficulties or his limitations as supported by the record. Nonetheless, the determination that he was capable of a range of unskilled, light work, well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI.  CONCLUSION

For the reasons stated above,  Defendant's Motion for Summary Judgment [Docket #19] is GRANTED, and Plaintiff's Motion for Summary Judgment [Docket #16] is DENIED.

IT IS SO ORDERED.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: March 22, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on March 22, 2018, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen